### THE STATE v. O'REILLY, *Appellant.*

#### Division Two, February 12, 1895.

126   597
152   324

1. **Criminal Law**: MURDER IN SECOND DEGREE. Evidence examined and *held* sufficient to authorize an instruction on murder in the second degree.

2. ———: EVIDENCE: PHOTOGRAPH. A photograph of the locality where deceased was killed, taken soon after the homicide, is admissible in evidence on the trial of defendant therefor.

3. ———: ———: DRUNKENNESS. Voluntary drunkenness constitutes no excuse or extenuation for the crime of murder; it is not even competent for the jury's consideration on the question of defendant's deliberation, premeditation or willfulness.

*Appeal from Montgomery Circuit Court.*—HON. E. M. HUGHES, Judge.

AFFIRMED.

*C. P. & J. D. Johnson* and *J. D. Barnet* for appellant.

(1) The evidence in the case as a whole does not support the verdict. The testimony does not present any elements of murder in the second degree. There should have been no conviction above the degree of manslaughter in the fourth degree. (2) The court

erred in admitting as evidence before the jury the pho-
tograph of the interior of the saloon on which were
grouped three prearranged figures to indicate the actors
in the homicide, depriving the defendant of the right
of cross-examination, with reference to the accuracy of
the positions assumed and giving undue weight to the
theory of part of the witnesses as to the manner in
which the homicide occurred, and this error of the
court was repeated by the refusal of the court to after-
ward give the instruction twice asked by the defendant
withdrawing such picture from the jury. (3) Al-
though the photograph of the interior of the saloon
may have been admissible in evidence to indicate the
physical surroundings, it was improper in the court to
allow the picture to go to the jury as a whole, without
an instruction indicating to the jury how far they had
a right to consider the picture as evidence. (4) The
general instruction given by the court of its own motion
is erroneous in giving any instruction as to murder in
the second degree.

*R. F. Walker,* Attorney General, and *C. O. Bishop*
for the state.

(1) The indictment is in proper form and there
is no error apparent upon the record. (2) The instruc-
tions fully covered the case and were favorable to
defendant. There was no self-defense in the case upon
the testimony of defendant, who persisted in the state-
ment that the shooting was wholly unintentional and
accidental. *State v. Smith,* 111 Mo. 406. It was upon
this theory that the court instructed for manslaughter,
and the only theory which warranted such instruction.
(3) The only evidence offered by defendant which was
excluded was that tending to show that at the time of
the shooting he was almost insensible from drink, and

that he was not only powerless but very drunk. This was clearly incompetent. *State v. Ramsey*, 82 Mo. 133; *State v. Carter*, 98 Mo. 176. (4) The testimony offered by the state in rebuttal was clearly competent. The witness Coudry having undertaken to describe the occurrence in the saloon, as an eye-witness, the state had the undoubted right to impeach him by showing that he was not there at all, but at another place. (5) The photograph offered in evidence by the state was competent. From time immemorial it has been customary to use diagrams and plans in the trial of criminal as well as civil cases, and where shown to be fairly correct have always been held proper for exhibition to the jury. Wharton's Crim. Evidence, sec. 544 *et seq.*; *People v. Jackson*, 111 N. Y. 362; 3 Rice on Evidence, sec. 103, p. 154.

BURGESS, J.—At the March term, 1893, of the St. Louis criminal court the defendant was indicted for murder in the first degree, charged with shooting with a pistol, and killing, one John J. Schmidt in said city on the twenty-second day of November, 1890. On application of defendant the venue of the cause was changed to the circuit court of Montgomery county, where, upon trial had to a jury, he was found guilty of murder in the second degree and his punishment assessed at ten years' imprisonment in the penitentiary. The cause is in this court on his appeal.

Deceased was the son of Capt. Joseph Schmidt, who, on the twenty-second day of November, 1890, kept a grocery and saloon in the city of St. Louis. About 5:30 on the evening of that day Capt. Schmidt was behind the bar in the saloon when defendant and three others came in and took some beer. About half an hour afterward defendant came in again, accompanied by a little girl, he having in his hand a pitcher

which he placed upon the counter and asked for ten cents' worth of beer. Schmidt drew the beer and handed the pitcher to defendant who looked into the pitcher and remarked, "You better give me another nickel's worth, that aint enough for my girl over the street. Schmidt then filled the pitcher and set it on the counter, when defendant remarked "I will pay you for this some other day when I come to Carondelet." About that time deceased came into the saloon behind the bar and stood alongside his father. At some remark of Capt. Schmidt, defendant took from his pocket something which he threw upon the counter, at the same time making to Schmidt a dirty, vulgar remark. The deceased pushed the beer over to defendant and told him to take it. Defendant then said "I will settle with you sons of bitches right now," drew his pistol and shot deceased, the bullet entering the upper part of the abdomen, from the effects of which he died on the twenty-ninth of November following the shooting.

Defendant proved a good character for peace and quiet, and introduced evidence tending to show that when he had received the pitcher full of beer from Captain Schmidt, he said to the latter "in a joking spirit," "what will you do with a man that has no money?" In reply to which Schmidt said that he would not give him the beer. Appellant then took from his pocket a half-dollar, and with his thumb and forefinger flipped or spun it on the counter, and it rolled off the counter behind. Schmidt charged defendant with having thrown the coin in his face, and when this was denied, called appellant a liar, came from behind the counter, caught him by the collar of his coat and said he would put him out, struck him in the chest and on his head and called to Johnnie (who stood at the money drawer) to bring "what was

in the drawer" and he would fix the Irish son-of-a-bitch; and then appellant drew his revolver and fired.

Defendant testified in his own behalf as follows: "After he (Captain Schmidt) struck me, I felt that I was going to be injured and I pushed my hand down behind me. He still had hold of me. I got the revolver up and raised the trigger on the hammer. In doing so at this very time the hammer fell and exploded a cartridge. I was trying at this time to cope with Captain Schmidt, who was attacking me. Immediately after that I became perfectly unconscious of further proceedings in that house. My last recollection, the moment I had the revolver in that position that I indicated, I took it out then and raised the hammer in order to intimidate him from attacking me; that moment, from what cause I do not know or understand, I became perfectly unconscious. I did not level or attempt to level the pistol at Johnnie Schmidt at any time or to shoot him. At the time the pistol exploded, I intended to use it on Captain Schmidt; I did not intend to injure Johnnie; the trigger accidentally fell down and exploded the cartridge; I had no reason to discharge the revolver in the direction it went; I did not mean to explode it; I intended to use it on Captain Schmidt, provided he continued his attack on me."

"*By the Court:* 'You did not intend to shoot Captain Schmidt at the time the revolver exploded— did you, or did you not?' *A*. 'I had it for the purpose of warding off his attack.'

"*Q.* 'Did you, when the revolver exploded, intend by that shooting to shoot Captain Schmidt?' *A.* 'That is the purpose I took it out for—it was the intention to njure Captain Schmidt.'

"*Q.* 'But it exploded prematurely, did it?' *A.* 'Yes.'

"*Q.* 'Accidentally discharged?' *A.* 'Yes.'

"*By Mr. Johnson:* 'You tried to get out your pistol to protect yourself against assault?' *A.* 'Against the assault of Captain Schmidt.'

"*Q.* 'It went off before you got it into position?' *A.* 'Yes.'"

In rebuttal the state offered testimony (over the objection of defendant) tending to show that one Alexander Coudry, who had testified as an eyewitness for defendant, was not present in the saloon at the time of the difficulty.

The court instructed for murder in the first and second degrees, manslaughter in the fourth degree, self-defense, and on the good character of defendant.

It is claimed that the court committed error in instructing for murder of the second degree. This contention is placed upon the ground that there was no evidence upon which to predicate such an instruction; but this is not borne out by the evidence, which, if the state's evidence is to be believed, tended strongly to show defendant guilty of murder in the second degree, if, indeed, not of the first degree; and of the weight of the evidence the jury were the sole and only judges.

The state over the objections of defendant was permitted to introduce in evidence and to present to the jury a photograph of the interior of the saloon in which the shooting occurred on which were grouped three prearranged figures to indicate the position of defendant, deceased, and the father of the deceased. It is argued, by counsel for defendant, that this deprived defendant of the right of cross-examination, with reference to the accuracy of the positions assumed, thus giving undue weight to the theory of part of the witnesses as to the manner in which the homicide occurred. This same question was raised by counsel for defendant by instruction after the evidence was all in, in which the

court was asked to withdraw and exclude from the consideration of the jury the photograph, but which was refused by the court. Both questions will be considered together, as the result of one is decisive of the other.

The photograph was taken shortly after the shooting and more than three years before the trial. It was shown to be· a true representation of the inside of the saloon at the time of the difficulty, and the positions of the three persons, as seen in the photograph, to be those, as near as could be determined by the witnesses, occupied by the defendant, deceased and Capt. Schmidt. It has always been permissible to use diagrams in the trial of causes, both civil and criminal, and especially in the latter class to use diagrams, if shown to be correct, to illustrate the position of persons and places, and to better enable the witnesses to properly locate them. If, then, a diagram may be used for such a purpose, we can see no good reason why a photograph may not be, by which is presented to view everything within the range of the camera at the time the photograph is taken. This did not deprive the defendant of the right to cross-examine the witnesses who testified to its correctness, and as to the positions of the persons in the saloon, or its fixtures. He had the same right in this regard that he would have had, had a diagram been used instead of the photograph.

In *Shaw v. State*, 83 Ga. 92, the prosecution, over the objection of defendant, introduced in evidence a photograph of the locality, scene of the homicide, and of persons who were placed in the positions said to have been occupied by the defendant and his accomplices at the time of the killing, and while.it was said that there was no necessity for using the photograph, it was held that there had been no error committed in admitting it.

In *People v. Jackson*, 111 N. Y. 362, a photograph

had been put in evidence, with the consent of the defendant, to show the place where the homicide was committed. It represented a street scene, and among other houses the one occupied by the deceased in his lifetime. A witness had seen part of the affair and the situation of the parties. He was present when the photograph was taken, and placed three persons in the highway to represent the position which, according to his recollection, they occupied at the time of the homicide. His testimony was admitted over the objections of defendant. And it was said: "The arrangement was not exact, but it was matter of description and served to indicate in a general way the impression left upon the mind of the witness. It aided his oral statement and was an essential and proper explanation of the circumstances attending the taking of the picture and of the picture itself."

A further contention is that the court committed error in excluding evidence offered by defendant tending to show that he was intoxicated at the time he did the shooting, as bearing upon the questions of premeditation, deliberation, and malice aforethought. It has so often been decided by this court that voluntary drunkenness is no excuse for, or extenuation of, the crime of murder, that it is unnecessary to say more than that there was no error committed in excluding such evidence. *Schaller v. State*, 14 Mo. 502; *State v. Harlow*, 21 Mo. 446; *State v. Pitts*, 58 Mo. 556. Nor could the jury take it into consideration in determining whether the defendant acted willfully, deliberately and premeditatedly. *State v. Cross*, 27 Mo. 332; *State v. Sneed*, 88 Mo. 138.

The jury were instructed upon every phase of the case authorized by the facts in proof, including that of good character, which instructions were eminently fair to the defendant and fully justified by the facts.

There was no reversible error committed during the trial so far as the record shows, and the judgment should be affirmed. It is so ordered. All of this division concur.